302 Ga. 892
FINAL COPY

S17A1526. JONES v. THE STATE.

BLACKWELL, Justice.

Hiram Jones was tried by a Dougherty County jury and convicted of felony murder and armed robbery in connection with the stabbing death of J.M. "Jake" King.[1] On appeal, Jones contends that he was denied the effective assistance of counsel because his trial lawyer opened a door for the prosecution to elicit otherwise inadmissible evidence of his bad character. Jones also argues that the trial court erred when it instructed the jury about the consistency (or

---

[1] King was killed on November 3, 2005. On January 25, 2006, a Dougherty County grand jury indicted Jones, charging him with malice murder, felony murder, two counts of aggravated assault, and armed robbery. Jones stood trial from March 12 to March 15, 2007. There was a mistrial as to malice murder (because the jury was unable to reach a unanimous verdict on that count), but the jury found Jones guilty of the other crimes with which he was charged. The trial court sentenced Jones to imprisonment for life for felony murder and a consecutive term of imprisonment for life for armed robbery. The trial court merged the aggravated assaults into the felony murder and armed robbery. Jones filed a motion for new trial on April 10, 2007, and he amended that motion several times, filing his final amendment on March 16, 2015. Following a hearing, the trial court denied the motion on February 2, 2017. Jones timely appealed, and this case was docketed to the August 2017 term of this Court and submitted for a decision on the briefs.

lack thereof) of his pretrial statements. After reviewing the record and briefs, we find no reversible error, and we affirm.

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows that Jones and Javario Beach talked about going to a fair on the evening of November 3, 2005, but Jones said that he could not go because he had no money. Beach went to the fair without Jones, and while he was there, Beach received several calls from Jones, asking Beach to pick him up. Beach left the fair and drove with two other friends to a home on Tremont Avenue in Albany, where they found Jones. They observed that Jones was "acting weird," "looked like something was wrong," was carrying a bag of clothes, and also was carrying between 80 and 100 dollars. They agreed to drive Jones to a home on North Madison Street.

The next day, King was found dead in a wooded area off Watkins Avenue. King was lying next to his taxicab, which had been wrecked, and the interior of which was covered in blood. The taxi meter indicated that one passenger was in the cab at the time it was wrecked. An autopsy later revealed that King had been stabbed 34 times, suffering five major wounds. His wallet, cell phone, and most of the cash that he was known to carry could not be found at the scene. Law

2

enforcement officers did find, however, a bloody pair of pants. In the course of their investigation, officers traced the pants to Jones, and they searched the home on Tremont Avenue, where they found a knife — which belonged to King and had King's blood on it — and a paper with the name of King's wife written on it.

Officers interviewed Jones on three occasions. In the first and second interviews, Jones offered that he was walking through the woods when he happened upon the wrecked taxicab. Jones said that he tried to help King, got blood on his hands as a result, and wiped his hands on the interior of the cab and his own pants. Jones explained that he was wearing gym shorts under his pants, and so, he simply took off his bloody pants and left them at the scene. After these interviews, officers let Jones speak with his father and uncle, and then with his mother. His mother urged Jones to tell the truth and to disclose if anyone else was with him on the evening in question. Jones told his mother that he did not know anything and that no one was with him. But after talking with his mother, Jones volunteered for another interview with the investigating officers.

In this third interview, Jones completely changed his story and admitted to being present when King was stabbed. Jones said that a man named "Allen"

approached him on November 3 at the home on North Madison and invited him to join Allen for a robbery. Jones agreed, Allen called for a taxicab, and King picked up Jones and Allen in his cab. King drove them to the south side of Albany, where he asked them to pay the fare. When they said that they had no money, King locked the doors of the cab and called his dispatcher. At that point, Jones said, Allen attacked King with a knife, and the cab went into the woods, where it crashed. Jones was unable to give a full name or address for Allen, but Jones told the officers that Allen lived in the neighborhood of the home on North Madison, that he had dark skin and dreadlocks, that he liked to wear camouflage clothing, and that he often rode a bicycle.

Officers subsequently found a man who lived in that neighborhood, matched the description given by Jones, and went by the name "Allen." That man cooperated with the investigating officers, submitting to an interview, a search of his home, and the taking of his fingerprints and a blood sample. But the officers found no evidence (aside from Jones's story) linking the man to the crimes. Beach had known Jones for many years and had never heard of an "Allen."

Jones testified at trial, where he told the jury that Allen approached him at the North Madison home on November 3. According to Jones, Allen mentioned that he intended to rob some drug dealers at some later point, but Jones only agreed to accompany Allen to a party at a location known as "Mt. Zion." Before proceeding to Mt. Zion, however, Jones wanted to drop by the home on Tremont Avenue to get a bottle of gin. Allen called for a taxicab, King picked them up, and he drove them first to Tremont Avenue and then toward Mt. Zion. Along the way, King stopped the cab, locked the doors, and told Jones and Allen: "Y'all go on and give me my money, and I finish taking y'all to y'all destination." At that point, Jones said, Allen lunged forward and began stabbing King. The cab lurched into the woods and crashed into a tree. Jones and Allen exited the cab, and Jones said that Allen then threatened him with the knife, warning him to keep quiet. Allen followed Jones to the home on Tremont Avenue, where Allen changed clothes before leaving. Jones explained that he initially gave a false account of the evening to the investigating officers because he was concerned about his grandmother (who lived at the Tremont house) and feared retribution from Allen and his associates.

5

Jones does not dispute that the evidence is sufficient to sustain his convictions. Nevertheless, as is our customary practice in murder cases, we independently have reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Jones was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Jones argues that he was denied the effective assistance of counsel when his trial lawyer questioned him on direct examination about his disciplinary record in jail, thereby opening a door for the prosecution to elicit testimony on cross-examination about his numerous bad acts while incarcerated. On direct, Jones volunteered that he had been in jail for a year and a half. His lawyer then asked: "Since you mentioned being at the jail for a year and a half, [have] you been in some trouble since you've been out there?" Jones answered in the affirmative, and his lawyer then asked about how many times Jones had been "written up." When Jones tried to explain himself and mentioned fighting officers in the jail, his lawyer moved on to another line of questioning. On cross, however, the prosecuting attorney questioned Jones extensively about his

6

disciplinary history at the jail, revealing that Jones was disciplined for possession of contraband tobacco, that Jones had as many as 30 disciplinary write-ups, that a psychiatrist at the jail may have told Jones that he was malingering, that Jones cursed at a female officer and called her a "b***h," that Jones purportedly attacked someone with a dustpan handle, that Jones was shackled and handcuffed in his cell because he "attacked so many people," and that, on one occasion, Jones smashed a video camera out of an officer's hand. Jones contends that this information was highly prejudicial, and he speculates that it may have led the jury to return a verdict based on its perception that he has a general propensity for violence.

To obtain relief based on ineffective assistance of counsel, Jones must show both that his counsel's performance was deficient and that this deficient performance prejudiced him. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Jones must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Jessie v. State, 294 Ga. 375, 377 (2) (754 SE2d 46) (2014) (citation and punctuation omitted)). To show prejudice, Jones must prove that his

counsel's error was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Strickland, 466 U. S. at 687 (III). To that end, Jones must show "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009) (citation and punctuation omitted). "If the defendant fails to satisfy either the 'deficient performance' or the 'prejudice' prong of the Strickland test, this Court is not required to examine the other." Jessie, 294 Ga. at 377 (2). See also Jones v. State, 290 Ga. 576, 578 (3) (722 SE2d 853) (2012).

Even assuming that Jones's trial lawyer performed unreasonably when she asked Jones on direct examination about his disciplinary history without knowing the answer, Jones has failed to prove that he was prejudiced as a result. No doubt, his disciplinary history at the jail does not cast Jones in a positive light, but the evidence of his guilt was very strong. There is no doubt that Jones was in the cab with King at the time King was killed. Although Jones tried to lay the blame for the killing upon Allen, the varying accounts that he gave in his pretrial interviews and at trial undercut his credibility. It is uncontroverted that Jones lied to officers in his first and second interviews when he denied being at

8

the scene when King was stabbed, he only identified Allen as the killer in his third interview after speaking with his mother, and although he continued at trial to identify Allen as the killer, his trial testimony was not entirely consistent with his third interview.[2] Aside from Jones's self-serving accounts, no evidence linked Allen to the killing. The taxi meter showed that the cab was occupied by only one passenger when it was wrecked. Before the killing, Jones said he could not go to a fair because he had no money; later that evening, he was seen with 80 to 100 dollars. Jones's bloody pants were found at the scene of the killing, and King's knife and paper were found at the home on Tremont Avenue, where Jones's grandmother lived.

In short, Jones admitted to being present when King was killed, the physical evidence suggested that Jones (and no one else) was present at the time of the killing, Jones needed money shortly before the killing, he came into possession of money around the time of the robbery and killing, and there were ample grounds for a reasonable jury to discredit Jones's self-serving accounts.[3]

---

[2] Most notably, Jones said in his third interview that he agreed to commit a robbery with Allen. At trial, Jones said that he agreed only to accompany Allen to a party.

[3] We note that, even if the jury might have given some credit to Jones's account about Allen stabbing King — a proposition that strikes us as far-fetched in light of the entire record

Considering the whole record, we find no reasonable probability that the jury would have acquitted Jones if only it had not heard about his disciplinary history at the jail, some of which may suggest a propensity for violence, but much of which merely concerns nonviolent mischief. Jones has failed to prove that he was prejudiced by the performance of his trial lawyer, and his claim of ineffective assistance fails. See Whitaker v. State, 291 Ga. 139, 142 (2) (728 SE2d 209) (2012) (allegedly improper testimony and argument about

---

— it still might properly have found Jones guilty of murder and armed robbery as an accomplice. After all, Jones said in his third interview that he had agreed to help Allen commit a robbery; at trial, although he said that he had only agreed to go with Allen to a party, Jones admitted that Allen had mentioned a robbery. Jones lied to investigating officers and withheld any mention of Allen until his third interview. And it was Jones — not Allen — who was observed with money after the robbery and killing, suggesting that Jones wound up with the proceeds of the crime. See OCGA § 16-2-20 (a person is a party to the crime if he "[i]ntentionally aids or abets in the commission of the crime"); Stewart v. State, 299 Ga. 622, 627 (2) (c) (791 SE2d 61) (2016) (evidence was sufficient to convict defendant of felony murder as party to a crime where he was present during the planning of the robbery that led to the murder, was seen walking with armed co-defendants toward the victims' room, fled the scene after shots were fired, and later participated in dividing the spoils of the robbery). See also Ross v. State, 276 Ga. 747, 748 (2) (583 SE2d 850) (2003) ("Unlike malice murder, felony murder does not require intent to kill; rather, the defendant only must have intended to commit the underlying felony." (citation and punctuation omitted)). The trial court instructed the jury on the relevant law.

defendant's behavior did not result in prejudice under Strickland, given "strong evidence" of defendant's guilt).

3. Jones contends that the trial court erred when it charged the jury that, "[w]hen a defendant's statements are not consistent with and do not explain other direct and circumstantial evidence, the defendant's explanation may be rejected by you, the jury, as triers of fact." Jones concedes that this charge is a correct statement of the law, but he complains that the trial court gave the charge in the midst of other instructions about the admissibility of his pretrial statements.[4] By the sequence of the charges, Jones argues, the jury may have been misled to believe that, if his statements were inconsistent, they were inadmissible and could not be considered at all, regardless of their credibility. In addition, Jones complains that the consistency instruction — taken together with another instruction that the jury could consider that "the defendant is interested in the outcome of the prosecution" — might have suggested to the jury that Jones had a greater motivation to lie than other witnesses and that his

---

[4] The charge in question was given close in time to instructions about the voluntariness of statements and violations of Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

11

testimony should, therefore, be given greater scrutiny. These arguments afford no ground for reversal.

Even when we find error in a jury charge, we will not reverse when the error is harmless, that is, when "it is highly probable that [the] instruction did not contribute to the verdict." Hodges v. State, 302 Ga. 564, 567 (3) (807 SE2d 856) (2017). See also Francis v. State, 266 Ga. 69, 72 (3) (463 SE2d 859) (1995). Any error in the consistency charge here was harmless. To begin, the trial court plainly instructed the jury that it could — not that it had to — disregard Jones's statements if they were inconsistent with other evidence. We doubt that the sequencing of the charges altered the plain import of this instruction in the minds of the jurors. Moreover, the trial court also charged the jury that they were to consider the court's instructions "as a whole," and it gave other specific instructions on the credibility of witnesses, including that the defendant's credibility "is to be tested by and subject to the same tests as are legally applied to any other witness." See Smith v. State, 280 Ga. 490, 492 (3) (629 SE2d 816) (2006) (an allegedly erroneous jury instruction "must be considered in the context of the court's instruction as a whole"). Finally, as discussed above, the evidence of Jones's guilt was very strong. In this regard,

12

if the jury had refused altogether to consider Jones's pretrial statements, it more likely would have helped Jones, as his pretrial statements were incriminating. Not only did they show that he lied to the police in his first two interviews, thereby undermining his credibility, but the most favorable of these statements (given in the third interview) was also inconsistent with his trial testimony and portrayed him as a willing participant in a robbery. In light of the foregoing, it is highly improbable that the consistency instruction contributed to the verdict, and we will not reverse on this ground. See Hodges, 302 Ga. at 567 (3) (any error in omitting a requested jury instruction was harmless where the evidence of defendant's guilt was "compelling" and where other instructions mitigated the omission).

Judgment affirmed. All the Justices concur.

Decided February 5, 2018.

Murder. Dougherty Superior Court. Before Judge Gray, Senior Judge.

Katherine L. Dodd, for appellant.

Gregory W. Edwards, District Attorney, Kathryn O. Fallin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General, for appellee.