305 Ga. 838
FINAL COPY

S19A0279.  STROTHER v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Kyle Strother was convicted of malice murder and other crimes in connection with the shooting death of Cristobal Becerre-Contreras. Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions; that the trial court failed to act as the "thirteenth juror" when it denied his motion for new trial; that the court erred by admitting character evidence related to gang activities and other murders; that his trial counsel provided ineffective assistance by "opening the door" to that character evidence; and that he was denied a fair trial when one of his co-defendants allegedly testified falsely. Each of Appellant's claims is meritless, so we affirm.[1]

---

[1] Becerre-Contreras was killed on December 21, 2015. On March 11, 2016, a Floyd County grand jury indicted Appellant, Kelesha Dorsey, and Delaney Ray for malice murder, felony murder, armed robbery, two counts each of aggravated assault (with intent to rob and with a deadly weapon) and

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the evening of December 21, 2015, Kelesha Dorsey sent a text message to Becerre-Contreras, a man she had met once and with whom she occasionally exchanged texts, asking if she could borrow $40. Becerre-Contreras replied that he would give Dorsey the money if she "g[a]ve [him] a blowjob," but Dorsey refused. He then offered to pay her $100 for sex and told her that he had enough money "to pay [her] rent for one year." Dorsey eventually sent Becerre-Contreras

aggravated battery (rendering Becerre-Contreras's body useless by beating his head with a gun and by shooting him in the head), and possession of a firearm during the commission of a felony. Appellant's trial was severed, and Dorsey and Ray testified for the State. The trial began on January 23, 2017, and on January 27, the jury found Appellant guilty of all charges. On March 7, 2017, the trial court sentenced him to serve life in prison without parole for malice murder, life in prison for armed robbery, a 20-year concurrent term for the aggravated battery count based on rendering Becerre-Contreras's body useless by beating his head with a gun, and five consecutive years without parole for the firearm offense. The felony murder count was vacated by operation of law, and the remaining counts merged. Appellant filed a timely motion for new trial, which he later amended with new counsel. At the end of an evidentiary hearing on February 20, 2018, the trial court amended the sentencing order to make Appellant's five-year consecutive sentence for the firearm offense parolable. On August 1, 2018, the trial court denied the motion for new trial, and Appellant then filed a timely notice of appeal. The case was docketed to the term of this Court beginning in December 2018 and submitted for decision on the briefs.

text messages agreeing to have sex with him for $120 and telling him to come to her apartment later that evening.

Dorsey then told her roommate Delaney Ray and Ray's boyfriend Appellant, who was known as "Droop," that she wanted Becerre-Contreras's money but did not want to have sex with him. Dorsey asked Appellant to "scare [Becerre-Contreras] away" after he gave her the money but before they had sex. Appellant instead proposed the following plan: Dorsey would tell Becerre-Contreras to pick her up at a nearby gas station and to drive her to her cousin's house where they could buy marijuana; Dorsey would instead lead Becerre-Contreras to a house that belonged to Appellant's friend Marcus Townsend; Appellant would rob Becerre-Contreras there; and Appellant, Dorsey, and Ray would then flee in Ray's car. Dorsey sent Becerre-Contreras a text telling him to pick her up at a gas station near Ray's apartment in Rome.

Around 10:15 p.m., Appellant and Ray dropped off Dorsey at the gas station to wait for Becerre-Contreras. Surveillance video showed Appellant park Ray's car at the gas station, enter the

convenience store, and then return to the car; Dorsey left the car moments later and entered the store as the car drove away. Appellant and Ray then drove to Townsend's house, and Appellant went into the back yard while Ray parked in a nearby cul-de-sac and waited in her car.

Ray sent a text to Dorsey at 10:15 p.m. saying, "make sure you don't lose [your] stuff," and then sent her directions to Townsend's house. Dorsey sent a text at 10:24 telling Ray, "Girl this man at a different store," and another at 10:29 saying, "I'm still waiting on him." Ray then sent texts instructing Dorsey: "TELL HIM BUY YOU WEED AND XANS but yall can get them to bring it to yall when yall get to 'yo cousin' house"; "make sure you look at [D]roop and make sure he straight"; and "[w]hen yall pull up yall go ahead and get out the car tell him yall got to use the back door cause you don't got the key to the front door."

The gas station's surveillance video showed Dorsey get into Becerre-Contreras's gray car and leave the gas station around 10:54 p.m. Per the plan, Dorsey told him to drive to her cousin's house so

they could buy marijuana, but she instead directed him to Townsend's house. At 11:03, Dorsey sent Ray a text saying, "We getting out now come on." Ray replied, "I'm in the circle run to me" and "[w]atch [D]roop as you run make sure he straight." Dorsey told Becerre-Contreras that her cousin was not home but had left the back door open. They walked to the back yard, where Appellant jumped out from behind a fence, raising a silver revolver above his head as if to hit Becerre-Contreras.

Dorsey did not see what happened next, because she ran to Ray's car in the cul-de-sac. Moments later, the two women heard a gunshot. Appellant then ran to the car and told Ray to "drive off." On the way to Ray's apartment, Appellant said that "he shot [Becerre-Contreras] in the head" and gave Dorsey and Ray each about $170 from Becerre-Contreras's wallet. Appellant then called Townsend and told him not to go to his house, saying "I may have made a mess in your backyard." At 12:41 a.m., Appellant sent a text to Townsend saying, "Read and destroy . . . don't go near ya spot fa a day or 2 . . . stay away." A couple of hours after the shooting, Ray

dropped off Appellant near Townsend's house to "clean the mess up," but Appellant returned to Ray's car moments later, saying that someone had been walking nearby. At 8:55 a.m., Appellant sent Townsend a text saying: "u kant go 2 da house . . . ain't s**t c[ ]hanged . . . jus pullup n report da s**t ya self . . . uon know nun . . . u kame home 2 a strange kar n a man layin in ya yard . . . yo prints ain't on s**t mine is . . . Read n destroy."[2] Appellant, Dorsey, and Ray then fled to his mother's house in Atlanta.

Investigators responded to a 911 call from Townsend reporting a dead body behind his house. In the back yard, they found Becerre-Contreras, who had died from a gunshot wound to the back of his head. He was lying face down with his arms underneath his body, and he had abrasions on his face and blunt force trauma to his head. A medical examiner later determined that Becerre-Contreras's head trauma was consistent with being struck with a gun and that he had been shot from above at close range. It appears that after being

---

[2] Ray and Dorsey testified that Townsend was out of town on the night of the shooting. Although the State subpoenaed Townsend to testify at trial, he failed to come to court.

struck with the gun in the head, he collapsed face down. Becerre-Contreras's phone, which showed the text messages he exchanged with Dorsey, was near his body, and his gray car was in the driveway. In a trash can outside the house, investigators found two receipts for prescription medications for Appellant. Investigators did not find any shell casings at the scene, which was consistent with a revolver being used in the shooting. Investigators later found a video on Ray's cell phone that showed Appellant with a silver revolver, and Ray testified that Appellant always carried that gun and had it that night.

The next day, investigators interviewed Dorsey and Ray separately; the video recordings of their statements were played for the jury. Both women initially said that they did not know anything about the shooting; that Ray and her friend "Squeaky," a drug dealer, had dropped off Dorsey at the gas station that evening, where she planned to get a ride to her boyfriend's house; and that Ray then dropped off "Squeaky" and drove alone to Atlanta. After investigators told Dorsey that they knew about her text messages to

Becerre-Contreras, she claimed that she and Becerre-Contreras planned to buy marijuana at Townsend's house from a man named "Tuck," who shot Becerre-Contreras when they arrived. Eventually, Dorsey and Ray both admitted the plan to rob Becerre-Contreras with their friend "Droop," who had robbed and then shot Becerre-Contreras. They then claimed that they did not know Droop's real name. Toward the end of Ray's interview, she identified Appellant as Droop and admitted that he was her boyfriend.

Dorsey and Ray were arrested after their first interviews. Investigators interviewed Ray again on December 30 and Dorsey on December 31, and the recorded statements were also played at trial. Both women named Appellant as the shooter, and the version of events they provided was substantially similar to their trial testimony.

Appellant did not testify at trial; his defense theory was that Dorsey and Ray initially refused to give investigators the name of the shooter and later falsely provided his name because they were afraid of the actual shooter. Dorsey and Ray, however, both said in

their first police interviews that they did not want to provide the shooter's name because it was someone they were close to. In addition, Ray indicated in her second interview that she was afraid of Appellant, and she testified that she initially refused to give the police Appellant's name because she was trying to protect him and that she was afraid of "getting hurt" if she identified him as the shooter. Dorsey testified that she had initially refused to provide Appellant's name because she had not wanted to be a "snitch." Both women also testified that they were not trying to protect an unidentified shooter.

2. Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions. When properly viewed in the light most favorable to the jury's verdicts, the evidence showed that Appellant, who was known as Droop, concocted the plan to rob Becerre-Contreras with Dorsey and Ray, who later identified Appellant as the shooter in their recorded statements to the police and at trial. In addition, Becerre-Contreras's phone showed the text messages that he exchanged with

Dorsey; surveillance video showed Appellant, who was driving Ray's car, drop off Dorsey at the gas station where Becerre-Contreras picked her up less than 45 minutes later; phone records showed that Dorsey and Ray then exchanged text messages that referenced the events leading up to the shooting and that in two of those texts, Ray instructed Dorsey to look at Droop and to make sure that Droop was "straight"; and Dorsey and Ray testified that Appellant carried a silver revolver that night, which was consistent with the absence of shell casings at the crime scene.

After the shooting, Appellant sent Townsend text messages referring to the murder and instructing Townsend to conceal Appellant's involvement. Appellant then fled to Atlanta with Dorsey and Ray. This evidence was easily sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Green v. State*, 304 Ga. 385, 387-388 (818 SE2d 535) (2018) ("'[I]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility

of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient.'" (citation omitted)).

3.     Appellant also contends that the trial court failed to act as the "thirteenth juror" in denying his motion for new trial on the so-called "general grounds" under OCGA §§ 5-5-20 and 5-5-21.[3] In exercising his discretion as the thirteenth juror, "the trial judge must consider some of the things that [he] cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence." *White v. State*, 293 Ga. 523, 524 (753 SE2d 115) (2013).

In his motion for new trial and at the hearing on the motion, Appellant raised the general grounds, citing OCGA §§ 5-5-20 and 5-5-21 and *White* to the trial court several times. In its order denying

---

[3] OCGA § 5-5-20 says, "In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury." OCGA § 5-5-21 says, "The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

the motion, the trial court referred to the numbered paragraphs in which Appellant asserted the general grounds in his motion and then said, "the State presented ample evidence to support the jury verdict and . . . the evidence was not sufficiently close nor represents a failure of justice in general." Contrary to Appellant's argument, the court's order plainly shows that the judge properly exercised his discretion under OCGA §§ 5-5-20 and 5-5-21. See *Burney v. State*, 299 Ga. 813, 815 (792 SE2d 354) (2016). See also *Price v. State*, 305 Ga. 608, 613 (825 SE2d 178) (2019) (explaining that unless the record shows otherwise, we will presume that the trial judge properly exercised his discretion as the thirteenth juror). To the extent that Appellant also challenges the merits of the court's denial of his motion for new trial on these grounds, we have repeatedly explained that "this Court does not sit as an arbiter of the general grounds, which are 'solely within the discretion of the trial court.'" *Wilson v. State*, 302 Ga. 106, 109 (805 SE2d 98) (2017) (citation omitted). Accordingly, this claim has no merit.

4.   Appellant contends that the trial court abused its

discretion by admitting into evidence Dorsey's and Ray's police-interview statements about Appellant's gang activities and Ray's interview statements about Appellant's committing other murders. Specifically, Appellant argues that this evidence was not relevant, violated OCGA § 24-4-404 (b)'s prohibition on bad character evidence and that statute's pretrial notice requirements, and was highly prejudicial and should have been excluded under OCGA § 24-4-403. We disagree.

(a) On the first day of trial, Appellant moved in limine to exclude evidence of his gang activities. The prosecutor agreed not to introduce the gang evidence unless it became relevant, and the trial court granted the motion. Later that day, the sergeant who had interviewed Dorsey and Ray testified for the State. During cross-examination, Appellant's counsel advanced his defense theory that Dorsey and Ray falsely provided Appellant's name to the sergeant because they were afraid of the actual shooter. Counsel emphasized Dorsey's and Ray's initial refusal to name the shooter during their first interviews and questioned the sergeant about the women being

afraid of Townsend and "other people" but not afraid of Appellant.

The next day, the prosecutor told the trial court that he planned to play Dorsey's and Ray's recorded police interviews during the State's re-direct examination of the sergeant. The prosecutor argued that Appellant's counsel had "opened the door" to statements in the interviews about Appellant's gang activities, which were now relevant to rebut the defense theory that the women were not afraid of Appellant and instead feared the actual shooter. Appellant's counsel objected based on relevance, but said, "in all candor, I knew that upon cross-examination [of the sergeant], the issue would come up because I would bring it up that they're not afraid, so . . . I'm going to take it as it comes." The trial court replied, "that goes back to trial strategy." Appellant's counsel agreed.

The prosecutor then told the court that during Ray's second interview, she said that Appellant bragged about having four "bodies" to his credit. The court said that the evidence "again[ ] goes to why she would be afraid" of Appellant and was admissible. Before the State played the recordings of Dorsey's and Ray's second

interviews for the jury, Appellant's counsel objected, arguing that Ray's statements contained hearsay, that the discussion about Appellant's other murders was "a three-minute discussion about what [Ray] has heard about [Appellant]," and that because Ray had not yet testified about whether she was afraid of Appellant, the gang evidence should be excluded. The trial court overruled his objection.

The State then played Ray's second recorded interview for the jury. In the interview, Ray said that Appellant was a member of the Bloods gang "and they take people out" and that his job as a gang member was to "sweep the streets." When the sergeant asked her whether Appellant had bragged about having "several bodies on his credit," Ray said that Appellant had "said that he's beat a case before about a body"; that she had heard people say that Appellant had killed four people; and that she had heard Appellant bragging about killing other people. When another investigator who was present during the interview asked if Ray thought Appellant was serious, she replied, "I mean not really because I thought maybe he would be caught." Ray said that she did not know any other information about

the bodies, and the investigators moved on to other questions.

The State then played the recording of Dorsey's second police interview. Dorsey told the investigators that Appellant was a member of the Bloods gang and that he hung out with other gang members after he fled with Dorsey and Ray to Atlanta.

During recross-examination of the sergeant, Appellant's counsel elicited testimony that there were no murder cases in Appellant's criminal history. The sergeant also testified that he was not aware of any local homicides that were unsolved and that Ray had heard the information about the four bodies from other people, not from Appellant.

(b)    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. "All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules . . . ." OCGA § 24-4-402. The statements about which Appellant complains became relevant

when his counsel elicited testimony supporting his theory of defense — that Dorsey and Ray first refused to name the shooter and later falsely accused Appellant because they were afraid of the actual shooter. That theory made relevant (or as the State frames it, "opened the door" to) evidence that Dorsey and Ray had instead initially refused to name Appellant because they were afraid of him.[4] Accordingly, the police-interview statements were relevant evidence under OCGA § 24-4-401. See *Parks v. State*, 300 Ga. 303, 309 (794 SE2d 623) (2016) (concluding that the appellant's prior felony convictions "became relevant evidence" that the State was entitled

---

[4] We have explained that "'opening the door' is a metaphor used for a variety of situations that arise in criminal and civil trials involving conduct by one party that allows the other party to introduce evidence that otherwise would not be allowed." *Smith v. State*, 299 Ga. 424, 430 n.5 (788 SE2d 433) (2016). We have cautioned, however, that

> "opening the door" is not a freestanding evidence rule allowing a party to present to the jury otherwise inadmissible evidence; the phrase appears nowhere in the new Evidence Code or in the Federal Rules of Evidence on which our new code was largely based. . . . Thus, litigants and trial courts should take care to identify the precise basis in the evidence rules – the ones in our *new* Evidence Code – for an argument that one side has "opened the door" to allow the admission of otherwise inadmissible evidence.

Id. (emphasis in original).

to explore after he testified that he had become more responsible but had been "in other trouble throughout [his] life").

(c)  As for Appellant's claim that OCGA § 24-4-404 (b) required the exclusion of the statements, he made no such objection at trial. We therefore review this claim only for plain error. See OCGA § 24-1-103 (d); *Gates v. State*, 298 Ga. 324, 326-327 (781 SE2d 772) (2016).

OCGA § 24-4-404 (b) is modeled on Federal Rule of Evidence 404 (b).[5] We therefore look to the decisions of the federal appellate courts, particularly the decisions of the Eleventh Circuit, for

---

[5] OCGA § 24-4-404 (b) says:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

guidance in construing and applying the rule. See, e.g., *Kirby v. State*, 304 Ga. 472, 480 n.5 (819 SE2d 468) (2018). The Eleventh Circuit has consistently held that even though Federal Rule 404 (b) precludes the admission of extrinsic evidence to prove a defendant's character in order to show that he acted in accordance with that character, "inadmissible extrinsic evidence is admissible on redirect [examination] as rebuttal evidence, when defense counsel has opened the door to such evidence during cross-examination." *United States v. West*, 898 F2d 1493, 1500 (11th Cir. 1990) (holding that the victim's testimony on redirect examination that he went into hiding after learning that the appellant tried to hire someone to kill him did not violate Rule 404 (b), because defense counsel had implied during cross-examination that the appellant's hit-man plans were not serious). See also, e.g., *United States v. Collier*, 385 Fed. Appx. 876, 878 (11th Cir. 2010) (concluding that the admission of evidence that the appellant threatened to kill the police officers who arrested him did not violate Rule 404 (b), because defense counsel had questioned one of the officers about the police report containing no

indication of any threats); *United States v. Johnson*, 730 F2d 683, 690 (11th Cir. 1984) (declining to address the appellant's claim that a witness's testimony about other crimes he committed with the appellant violated Rule 404 (b), because the testimony was "properly admitted as rebuttal evidence and did not violate [Federal Rule of Evidence] 403"). Cf. *Parks*, 300 Ga. at 308-309 (concluding that the appellant's testimony "opened the door" to evidence of his other felony convictions, "regardless [of] whether his character was implicated").

The State did not introduce Dorsey's and Ray's police-interview statements for any of the purposes listed in OCGA § 24-4-404 (b), but rather to rebut Appellant's defense theory seeking to cast doubt on those witnesses' identification of the shooter. Indeed, the State made no attempt to prove that Appellant had *actually* been a gang member or committed other murders. The trial court did not err, plainly or otherwise, by not excluding the statements under OCGA § 24-4-404 (b). And because the statements did not come under § 24-4-404 (b), Appellant's argument that the State failed to provide the

pretrial notice required by § 24-4-404 (b) also fails.

(d)    We likewise reject Appellant's claim that the police-interview statements were so prejudicial as to be inadmissible. Again, Appellant did not object on this ground during trial, so this issue is reviewable only for plain error. See OCGA § 24-1-103 (d). Under OCGA § 24-4-403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." We have explained, however, that

> "Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."

*Anglin v. State*, 302 Ga. 333, 337 (806 SE2d 573) (2017) (quoting *United States v. Edouard*, 485 F3d 1324, 1344 n.8 (11th Cir. 2007)).[6]

The State needed to, and was entitled to, counter the defense theory challenging the credibility of its two main witnesses. See

---

[6] Like OCGA § 24-4-404 (b), OCGA § 24-4-403 materially tracks its counterpart in the Federal Rules of Evidence; we therefore again look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in applying this provision. See *Kirby*, 304 Ga. at 480 n.5.

*Brannon v. State*, 298 Ga. 601, 608 (783 SE2d 642) (2016) (concluding that evidence of the appellant's other crimes was admissible under OCGA § 24-4-403, because the evidence was necessary to counter the appellant's testimony and defense theories). See also *Olds v. State*, 299 Ga. 65, 76 (786 SE2d 633) (2016) (explaining that probative value depends in part on the need for the evidence). That Dorsey and Ray believed Appellant was a member of the Bloods gang, and that Ray thought Appellant might have committed other murders, made it considerably more likely that the reason they hesitated in naming him as the shooter was fear of him, and considerably less likely that they falsely accused him because they feared someone else. See *Olds*, 299 Ga. at 75 (noting that the "greater the tendency to make the existence of a fact more or less probable, the greater the probative value").

Moreover, the prejudice stemming from the gang- and murder-related statements was significantly reduced by other evidence. After Ray made her statements about the other "bodies," she told the investigators that she did not really believe Appellant when he

bragged about other murders, and the sergeant testified that there was no evidence that Appellant had been involved in other murders. And as mentioned above, the State made no attempt to prove that Appellant had actually been a gang member or committed other murders. Indeed, the prosecutor did not question Dorsey, Ray, or any other witness about Appellant's gang activities or other crimes, and although closing arguments were not transcribed, Appellant does not contend that the prosecutor emphasized (or even mentioned) that evidence during his closing.

Viewed in full context, the admission of the disputed statements was not a blatant abuse of discretion under OCGA § 24-4-403 that would qualify as "clear or obvious" error. See *Gates*, 298 Ga. at 327 (explaining that plain error requires, among other things, that the error alleged was "'clear or obvious, rather than subject to reasonable dispute'" (citation omitted)). See also *Anglin*, 302 Ga. at 337 (concluding that the trial court did not abuse its discretion in determining that evidence of the appellant's gang affiliation was admissible under OCGA § 24-4-403); *United States v. Fortenberry*,

971 F2d 717, 721 (11th Cir. 1992) (holding that the trial court did not abuse its discretion under Federal Rule 403 in admitting evidence that the appellants were involved in an uncharged double murder). Appellant's claim fails.

5. Appellant also contends that his trial counsel provided ineffective assistance by employing a defense strategy that opened the door to the police-interview statements discussed above. To prevail on this claim, Appellant must show both that his counsel's performance was professionally deficient and that, but for the unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). We need not review both parts of this test if Appellant fails to prove one of them. See *Jones v. State*, 302 Ga. 892, 895 (810 SE2d 140) (2018).

Although trial counsel's defense strategy appears reasonable under the circumstances of this case, we need not decide that question, because Appellant has not proved that any deficiency in

counsel's opening the door to the statements likely affected the outcome of his trial. As discussed in Divisions 1 and 2 above, the other evidence of Appellant's guilt was very strong, and as discussed in Division 4 above in relation to his OCGA § 24-4-403 claim, the harm resulting from Dorsey's and Ray's police-interview statements about Appellant's gang activities and other murders was limited. Accordingly, Appellant's ineffective assistance claim fails. See *Jones*, 302 Ga. at 896 (concluding that the appellant could not establish the prejudice required to show ineffective assistance, because even though his trial counsel opened the door to proof that he had committed other violent acts, the evidence of his guilt was very strong); *Dennard v. State*, 305 Ga. 463, 466 (826 SE2d 61) (2019) (holding that any error in the trial court's admission of the appellant's prior convictions was harmless in light of the overwhelming evidence of his guilt).

6. Finally, Appellant claims that his convictions must be reversed because Dorsey allegedly testified falsely at his trial that the State had not offered her a plea deal. We reject this claim as

well.

During her direct examination at trial, Dorsey testified that she had not been offered anything to testify and that she had not been promised anything, but that she hoped she would be offered a plea deal in exchange for her testimony. After the trial, Dorsey filed a motion in her own pending case to enforce an alleged plea offer from the State. At an evidentiary hearing on April 3, 2017, Dorsey and her counsel asserted that the State had tacitly offered her a plea deal before Appellant's trial: in exchange for her truthful testimony against Appellant, she would be allowed to plead guilty to armed robbery, and she would be sentenced to a total of 20 years to serve 10 in prison. Dorsey testified that she believed that she had been offered that deal when she testified at Appellant's trial; that the prosecutors and her lawyer instructed her to lie about the deal; and that she lied when she testified that she did not have a plea deal. Dorsey's counsel testified that he offered Dorsey's testimony against Appellant to the State in exchange for her guilty plea to armed robbery; that the State accepted his terms when they decided to use

Dorsey's testimony; that the prosecutors said that they could not put an offer in writing; and that it was a "wink, wink, nudge, nudge" deal.

The two prosecutors handling Appellant's case and the Floyd County District Attorney, however, testified that their practice was not to extend plea offers to testifying co-defendants prior to trial and that they had not made a plea offer to Dorsey before Appellant's trial.[7] Ray's counsel testified that Ray had not been offered a plea deal prior to her testimony at Appellant's trial. In addition, a deputy sheriff who was present at a meeting between the prosecutors and Dorsey shortly before Appellant's trial testified that the prosecutors "repeatedly" told Dorsey that they were not offering her a plea deal at that time. On April 12, 2017, the trial court denied Dorsey's motion, ruling that she had presented "no evidence, other than the understanding or hope of [her counsel,] as to an agreement."

At Appellant's motion for new trial hearing in February 2018,

---

[7] The Floyd County District Attorney testified that on March 10, 2017 — three days after Appellant was sentenced, which was six weeks after the trial ended — she offered Dorsey a plea deal of 40 years to serve 20 in prison.

Dorsey testified that she did not remember whether she had a plea deal when she testified at trial, and the transcript from her April 2017 hearing was admitted into evidence. In its order denying Appellant's motion, the trial court found that after Appellant's trial, Dorsey changed her testimony about her supposed plea deal "because she was hoping to receive a lighter sentence." The court added, "It is clear that Dorsey testified truthfully at the trial and when it appeared to benefit her[,] changed her testimony."

It is well-established that

the State has "a duty to reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness, and a failure to disclose such an agreement constitutes a violation of the due process requirements of *Brady v. Maryland*, 373 U. S. 83 (83 SC[t] 1194, 10 LE2d 215) (1963)." *Wimes v. State*, 293 Ga. 361, 362 (2) (744 SE2d 787) (2013). See also *Giglio v. United States*, 405 U. S. 150, 154-155 (92 SCt 763, 31 LE2d 104) (1972). In addition, the State may not knowingly use a witness's false testimony that [she] received no promise of consideration in exchange for [her] testimony, and the prosecutor's failure to correct such testimony that he knows to be false denies the defendant his right to due process of law. *Napue v. Illinois*, 360 U. S. 264, 269-270 (79 SCt 1173, 3 LE2d 1217) (1959); *Smith v. Zant*, 250 Ga. 645, 651 (3) (301 SE2d 32) (1983).

*Nwakanma v. State*, 296 Ga. 493, 495-496 (768 SE2d 503) (2015), disapproved of on other grounds by *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018). It is also well established that "'[t]he trial court's findings of fact on motion for new trial are upheld unless clearly erroneous.'" Id. at 497 (citation omitted).

Here, the record supports the trial court's finding that the State had no agreement with Dorsey prior to Appellant's trial and that she did not testify falsely at trial when she said there was no plea deal. See *Nwakanma*, 296 Ga. at 497. To the extent that Dorsey and her counsel hoped or expected that her testifying at Appellant's trial would later benefit her, that does not establish a plea agreement, see *Klinect v. State*, 269 Ga. 570, 572 (501 SE2d 810) (1998), nor does it establish the prosecution's knowing use of false testimony, see *Nwakanma*, 296 Ga. at 497. This claim too is without merit. See *Wimes*, 293 Ga. at 363.

Judgment affirmed. All the Justices concur.

Decided May 20, 2019.

Murder. Floyd Superior Court. Before Judge Durham.

Kenneth W. Sheppard, for appellant.

Leigh E. Patterson, District Attorney, Luke A. Martin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.