**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 19, 2023

S23A0857. CLEMENTS v. THE STATE.
S23A1030. VELAZQUEZ v. THE STATE.

LaGrua, Justice.

Appellants London Clements and Eric Velazquez were jointly tried for murder and other offenses connected to the shooting death of Hall County Deputy Sheriff Blane Dixon on July 7, 2019. Clements was convicted of felony murder, and Velazquez was convicted of malice murder and other crimes.[1] Although the two co-

---

[1] On August 19, 2019, a Hall County grand jury indicted Hector Garcia-Solis, Brayan Cruz, Clements, and Velazquez—individually and as parties concerned in the commission of a crime—for the following counts: malice murder (Count 1—Garcia-Solis, Cruz, Velazquez, and Clements); felony murder predicated on aggravated assault on a peace officer (Count 2—Garcia-Solis, Cruz, Velazquez, and Clements); felony murder predicated on conspiracy to commit robbery and burglary (Count 3—Garcia-Solis, Cruz, Velazquez, and Clements); aggravated assault on a peace officer (Count 4—Garcia-Solis, Cruz, Velazquez, and Clements); conspiracy to commit robbery and burglary (Count 5—Garcia-Solis, Cruz, Velazquez, and Clements); burglary in the second degree (Counts 7, 8, 9, 10, 11, and 14—Garcia-Solis and Velazquez); entering an automobile (Count 12—Garcia-Solis and Velazquez); and criminal attempt to commit burglary, second degree (Count 13—Garcia-Solis and Velazquez).

defendants raise different enumerations of error on appeal, their appeals have been consolidated for purposes of issuing an opinion.

On appeal, Clements contends that: (1) the trial court erred by denying his motion for a directed verdict on the conspiracy to commit robbery and burglary count and the felony murder count predicated thereon; and (2) the trial court failed to exercise its discretion to

Cruz entered a guilty plea to Counts 4 and 5 and testified for the State at trial. Garcia-Solis, Velazquez, and Clements were jointly tried from June 21 to July 8, 2021. At trial, the trial court granted Clements's motion for directed verdict as to Counts 1, 2, and 4, and the jury found Clements guilty on Counts 3 and 5. The jury found Velazquez guilty on all counts. Garcia-Solis was also found guilty on all counts, but his case is not part of this appeal. As to Clements, the trial court sentenced Clements to life in prison on the felony murder count (Count 3), and the conspiracy to commit robbery and burglary count (Count 5) merged with the felony murder count for sentencing purposes. As to Velazquez, the trial court sentenced Velazquez to life in prison on the malice murder count (Count 1), plus a total of 35 consecutive years to serve for Counts 5 and 7-14. The trial court merged the aggravated assault count (Count 4) and purported to merge the felony murder counts (Counts 2 and 3) into the malice murder conviction (Count 1), but the felony murder verdicts were actually "vacated by operation of law." *Graves v. State*, 298 Ga. 551, 556 (4) (783 SE2d 891) (2016). "This error in nomenclature was harmless, however, because" Velazquez "was not convicted of or sentenced for the felony murder counts." *Worthen v. State*, 304 Ga. 862, 865 (2) (823 SE2d 291) (2019).

Clements and Velazquez filed timely motions for new trial, which they amended through new counsel. After holding evidentiary hearings on the motions for new trial, the trial court denied the motions on August 30, 2022. Clements and Velazquez filed timely notices of appeal to this Court, and their cases were docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

grant his motion for new trial on the general grounds. Velazquez contends on appeal that: (1) there was insufficient evidence to support his conviction for malice murder and felony murder predicated on aggravated assault on a peace officer; (2) the trial court erred by denying his motion for a directed verdict as there was insufficient corroboration of his co-conspirators' testimony; (3) the trial court erred by denying Velazquez's motion to transfer venue; (4) the trial court erred by denying Velazquez's motion for mistrial; and (5) Velazquez received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights under the United States Constitution. For the reasons that follow, we affirm the convictions in both cases.

The evidence presented at trial showed that, on the morning of July 2, 2019, two residents of Hall County discovered that their vehicles had been stolen overnight and reported the thefts to law enforcement. On the afternoon of July 7, law enforcement officers discovered the stolen vehicles—a 2009 red Dodge Caliber and a 2002 silver Toyota Avalon—parked behind a thrift store in Hall County.

3

Because the officers suspected the vehicles had been utilized in a series of burglaries committed the day before, the officers did not immediately inform the vehicle owners that their vehicles had been located; instead, as detailed below, the officers affixed GPS trackers to these vehicles in hopes of apprehending the suspects involved.

(a) *The July 6 burglaries and initial investigation*

During the early morning hours of July 6, several break-ins occurred at automobile dealerships and pawnshops in the Hall County area. Because most of the pawnshops were equipped with security systems to monitor after-hours activity, the burglaries and attempted burglaries at the pawnshops—namely, Swap and Trade Pawn, Foxhole Guns and Archery, and Double Deuce Pawn and Gun—were the first incidents to be reported to law enforcement. Based on surveillance video recordings from the pawnshops, law enforcement officers were able to establish that, between 3:15 a.m. and 5:20 a.m. on July 6, two suspects—each carrying firearms and wearing dark clothing, a mask, and gloves—broke into or attempted

4

to break into the pawnshops.[2] The surveillance video recordings also established that the suspects gained entry to at least one of the pawnshops by attaching a strap to the front doors of the shop, connecting it to the rear tailgate of a pickup truck, and pulling the truck forward to force open the doors. Two crossbows were stolen from Swap and Trade Pawn and 23 firearms—including handguns, rifles, and revolvers—and ammunition were stolen from Double Deuce Pawn and Gun.[3]

While investigating the pawnshop burglaries on the morning of July 6, law enforcement officers learned that several automobile dealerships had also been broken into overnight, including Los Plebes Auto Sales, Texano Auto Sales, Texas Trucks and Autos, and Eddie's Auto Sales.[4] Francisco Cuella, the owner of Los Plebes Auto

---

[2] The owner of Foxhole Guns and Archery testified that, because he had installed steel roll down doors and bars on the exterior of the building, the suspects attempting to break into the pawnshop were unable to gain access inside.

[3] The owner of Swap and Trade Pawn testified that he also sold guns at his pawnshop, but "they [we]re all locked in safes" and thus were inaccessible.

[4] The owners of Texas Trucks and Autos and Eddie's Auto Sales testified that, although their businesses were burglarized and some of their property was damaged, nothing was stolen from their dealerships.

Sales, testified that, when he arrived at the dealership around 9:00 a.m. on July 6, he realized that five pickup trucks had been stolen from his lot, including a 2015 Dodge Ram 2500, which law enforcement officers later established was the pickup truck used in the burglary at Swap and Trade Pawn. Cuella testified that one of the other stolen pickup trucks was discovered later that morning in a nearby neighborhood.[5] According to Cuella and law enforcement officers investigating the thefts, a doorbell camera installed on the exterior of one of the houses in this neighborhood captured video recordings of the stolen pickup truck driving into the neighborhood, followed by a red Dodge Caliber. The video recordings also showed two men "jump out of the truck to get in a red Caliber." Based on surveillance video recordings from Los Plebes, law enforcement officers were able to establish that the dealership was broken into around 1:23 a.m. on July 6, that the suspects were wearing dark clothing, face masks, and gloves, and that at least one of the suspects

---

[5] The remaining pickup trucks were located by law enforcement officers throughout the day.

was armed with a handgun.

Celia Hernandez, the office manager for Texano Auto Sales, testified that Texano was also burglarized during the early morning hours of July 6. Based on surveillance video recordings from Texano, law enforcement officers determined that two suspects—armed with handguns and wearing dark clothing, masks, and gloves—broke into the dealership's office, at which point, one of the suspects started going through files inside the office. When Hernandez examined the office after the burglary, she noticed that a file had been dropped on the floor that related to "an incident with [Garcia-Solis] in their business." Hernandez testified that, in 2018, Garcia-Solis broke into a pickup truck located at the dealership—an incident for which Garcia-Solis was later charged—and Hernandez kept a file on the incident. Hernandez advised law enforcement officers investigating the July 6 burglary that Garcia-Solis might be involved because she discovered this file on the floor and because she noted in the video recording "the interest [the man] took in reading [the file]." According to Hernandez, no cars were stolen from the dealership

during the July 6 burglary because the exit was blocked with other cars.

Holly Lester, a DeKalb County crime scene investigator who resided in Hall County at the time, testified that, between the late-night hours of July 5 and early morning hours of July 6, "crime scene investigative tools" and "various police equipment"—including a radio, gun belt, flashlight, bulletproof vest, and baton—were stolen from her county-owned van, which was parked in front of her residence. At trial, Lester reviewed images from the surveillance video recordings of the burglary at Double Deuce Pawn and Gun on July 6, and she confirmed that a bulletproof vest worn by one of the suspects in the video and the baton he was carrying appeared to be "consistent with" the vest and baton "missing out of [her] van."

After compiling and reviewing the surveillance video recordings from the impacted dealerships and pawnshops, law enforcement officers were able to establish that the same suspects likely committed all the burglaries, as they were wearing "the same masks and clothing in all of the thefts." On the afternoon of July 7,

8

Investigator Jeremy Grindle with the Hall County Sheriff's Department discovered the stolen red Dodge Caliber and silver Toyota Avalon parked behind a thrift store in Hall County. Investigator Grindle testified that, because he had seen a red Dodge in the doorbell video recording on July 6, he "believed that the red Dodge Caliber was involved in these . . . thefts." Investigator Grindle and other law enforcement officers affixed trackers "to the bottom of the frame of the car[s]" to "emit[] a GPS signal" that law enforcement officers could monitor. Later that evening, Investigator Grindle met with the oncoming patrol shift, including Deputy Dixon and his commanding officer, Sergeant Charles Hewell, to explain the tracking system and what to do in the event the stolen cars started moving.

    (b)   *The events leading up to the identification and apprehension of Velazquez, Garcia-Solis, Clements, and Cruz*

        (i)   *The events of July 6*

Antony Macias—a friend of the co-defendants—testified at trial that he learned about the automobile dealership and pawnshop

9

burglaries on July 6 while he was at his uncle's 50-acre ranch in Hall County preparing for a family party. Macias testified that a friend named "Adrian"[6] contacted him around 12:00 p.m. to ask if Garcia-Solis and Velazquez could come shoot guns at the ranch that afternoon, and a few minutes later, Velazquez, Garcia-Solis, and Adrian "pulled up" to the ranch in a "red Dodge car." When Velazquez and Garcia-Solis arrived at the ranch, they told Macias that "they had some stolen guns" and asked to shoot them at the ranch. Macias testified that Velazquez and Garcia-Solis opened the trunk of the Dodge, and there were "two handguns and a shotgun" inside. One of the handguns was a gray .45-caliber that "had a little like skull" or "helmet" on it, and the other was a 9-millimeter handgun. Macias also saw Adrian carrying a handgun that Velazquez and Garcia-Solis had given to him, and Macias observed an AK-47 rifle on the backseat of the car. Macias asked Velazquez and Garcia-Solis where they had gotten the guns, and Velazquez told him that "they had tried to go rob some Foxhole gun store and

---

[6] Macias testified that he did not know Adrian's last name.

that when they threw a rock that the alarm went off and they got scared." Velazquez and Garcia-Solis then told Macias that they "jumped the street to the other pawnshop where they got those guns."[7] Macias testified that Velazquez and Garcia-Solis explained to him that "they had reversed a truck and tied the door to the truck or something like that, and they yanked it and . . . that's how they got the guns." Macias's understanding was that Velazquez and Garcia-Solis had stolen about 20 guns, and they "wanted to sell" the guns to make money. Macias testified that Velazquez, Garcia-Solis, and Adrian stayed at the ranch shooting until about 1:30 or 2:00 p.m.

Later that afternoon, Cruz and Clements met up with Adrian at Adrian's house, and Cruz testified that Adrian showed them "two Glock pistols" he had in his possession. Cruz testified that he was impressed by how "clean" and "nice" the pistols were. According to Cruz, Clements was also "amazed" by the guns, and "he really

---

[7] The owner of Double Deuce Pawn and Gun testified that his pawnshop is located across the street from Foxhole Guns and Archery.

11

wanted one." Cruz and Clements hung out with Adrian for a few hours, "smok[ing] weed" and watching "videos of the guns."

That night, Cruz and his friend, Jiovanny Castillo, went to a party, and as they were driving home around 9:00 p.m., the road was closed by a police roadblock. Castillo was driving, and when he saw the police, he turned the car around because he did not have a driver's license. The police followed the car. Castillo "took off" and "lost the police," but he ended up crashing the car. "The closest house was Adrian's," so the two men walked to Adrian's house. Cruz testified that, as they were approaching Adrian's house, he saw three people standing outside—Velazquez, Garcia-Solis, and Adrian—and each of them had a gun. Garcia-Solis was also wearing a bulletproof vest. Velazquez and Garcia-Solis told Cruz and Castillo that "they robbed a pawnshop and how they got a truck and tied it on the door and started getting guns." At trial, Cruz watched the surveillance video recording from the burglary at Double Deuce Pawn and Gun and identified Velazquez and Garcia-Solis as the men who were burglarizing the pawnshop based on their "height"

and body-type. Cruz and Castillo testified that, around 10:00 p.m. that night, Garcia-Solis gave Cruz, Castillo, and Velazquez a ride in a "four-door," red Dodge, which Garcia-Solis told them was stolen, and Velazquez and Garcia-Solis also told them more about how they had "hit a lick" and "robbed the pawnshop" the night before. Garcia-Solis then drove the group to a thrift shop and parked behind it. Garcia-Solis gave Cruz the key to the Dodge in case Cruz wanted to use the car, and they walked over to Garcia-Solis's house. After that, Cruz "caught a taxi back home."

(ii)     *The events of July 7*

According to Cruz, on the morning of July 7, he and Clements got together to "smok[e] weed and chill[]," and while they were hanging out, they started talking about how Velazquez and Garcia-Solis "did a big robbery" and "robbed a pawnshop." Cruz observed that Clements was "eager," and Clements told Cruz that he wanted to "try to get a gun," as well. Cruz and Clements texted Garcia-Solis about trying "to go hit a lick, to do a robbery, a burglary." Garcia-Solis asked Cruz to "pick him up, because he thought [Cruz] had the

13

red Dodge" since he gave Cruz the key to it the night before.

Around 6:00 p.m., Cruz and Clements "caught a taxi" to Garcia-Solis's house, but Garcia-Solis was not there. Cruz and Clements then walked over to Castillo's house, where they hung out "[c]hilling, smoking." Clements started communicating "through Snap-Chat" with Velazquez, after which Cruz and Clements told Castillo that they were "going to hit a lick at the pawn store" to "steal the guns and sell them." Castillo testified that the group was planning to wear "[g]loves, mask[s], all black" and that they were going "to go and hit these pawnshops" in a "[s]tolo"—another term for a "stolen vehicle." Cruz and Clements secured a ride to Velazquez's house with a friend, and before they left Castillo's house, they asked if he wanted to come with them "[t]o hit a lick." Castillo testified that he "had butterflies in his stomach," and he "didn't want to go." When Cruz and Clements arrived at Velazquez's house that night, Garcia-Solis was already there, and the group discussed "hitting a lick" and how they needed to wear masks and gloves to ensure they did not leave their "fingerprints or DNA on the stolen vehicle" or anywhere

14

else.

(iii)     *The police chase and subsequent shootings*

Around 10:00 p.m. on July 7, a friend drove Cruz, Clements, Velazquez, and Garcia-Solis to the thrift store where the stolen cars were parked. The men got into the Dodge and "gear[ed] up" by "putting on gloves, masks, [and] getting ready." Cruz testified that Velazquez and Garcia-Solis also had handguns with them. According to Cruz, the group realized the Dodge did not have any gas, so they "just hopped in a gray Toyota" that was also parked behind the thrift store, as well. Velazquez was driving, Garcia-Solis was in the front passenger seat, Clements was in the backseat behind Garcia-Solis, and Cruz was in the backseat behind Velazquez. The group decided to "ride around and see what [they] could spot." According to Cruz, as soon as they turned out of the thrift store and started driving up the street, a law enforcement officer pulled up behind them and "start[ed] flashing his lights." Cruz testified that Velazquez kept driving, and a "police truck" drove up and "parked right in front of [them], and [they] went [i]n

15

the other lane" and "lost him." Cruz said he started "panicking" and told Velazquez to pull over because he "didn't want to get in that much trouble," but Clements and Garcia-Solis told Velazquez to keep driving. Velazquez started "hitting . . . mailboxes" and eventually ran into a telephone pole. Cruz testified that, when Velazquez hit the telephone pole, "[they] all ran," and Velazquez and Garcia-Solis were armed at the time. According to Cruz, as he ran away from the crash site, Clements was behind him, followed by Garcia-Solis. Surveillance video recordings from a nearby laundromat also confirmed that the defendants fled the car crash together.

Cruz testified that Deputy Dixon, the victim in this case who was later shot and killed by Garcia-Solis, was running after them, and at that point, Cruz started running into the yards of the residences in the area, "jumping" over fences. Cruz saw a flashlight, assumed it was a police officer, and hid under a shed behind one of the houses. While Cruz was under the shed, he "heard the officer give [Garcia-Solis] instructions like put your hands up, put your

16

hands up." Cruz testified that "[i]t got quiet for a few seconds," and then, he heard gunshots. Cruz "thought the police were shooting." Cruz testified that he stayed under the shed all night.

Sergeant Hewell testified that he came on shift on the evening of July 7, shortly after the stolen Dodge and Toyota had been located and the GPS tracking systems had been affixed to these vehicles. According to Sergeant Hewell, he and Deputy Dixon were keeping a watch on the vehicles, and as soon as one of the stolen cars—the Toyota Avalon—started to move away from its location behind the thrift store, he advised Deputy Dixon to follow it. Minutes later, Deputy Dixon alerted Sergeant Hewell that he had located and was behind the vehicle, and Sergeant Hewell joined Deputy Dixon and attempted to block the path of the Toyota. The suspects were able to get away, but Deputy Dixon and Sergeant Hewell continued their pursuit. According to Sergeant Hewell, the Toyota ultimately crashed into a telephone pole, and when he reached the crash site, Sergeant Hewell saw Deputy Dixon and the suspects running from the site of the crash. Sergeant Hewell then "exited [his] vehicle and

17

gave chase behind them."

Sergeant Howell started following the suspects into the adjacent neighborhood, "hopping chain-link fences" and "running behind these houses." As Sergeant Hewell was running through the area, he heard Deputy Dixon yell, "Hey, Sarge, I have one." Sergeant Hewell testified that he ran towards Deputy Dixon's voice and overheard Deputy Dixon give the suspect commands. As Sergeant Hewell got closer, he heard "shots fired from the suspect." Sergeant Hewell then heard Deputy Dixon say, "I'm hit."

The video recordings from Deputy Dixon's body camera, which were admitted into evidence through the testimony of GBI Special Agent Jamie Abercrombie at trial, showed that Garcia-Solis was standing at the corner of a house when Deputy Dixon made contact with him and that Garcia-Solis had something in his hand. Agent Abercrombie testified that the video recording also reflected that Deputy Dixon gave Garcia-Solis commands to show his hands, but Garcia-Solis did not follow the commands and walked behind the house. According to Agent Abercrombie, the video recording then

18

showed a "muzzle flash from [Garcia-Solis's] gun as he t[ook] the first shot at Deputy Dixon." The first shot was "followed by four more" shots. Deputy Dixon then moved up to the porch of the house, and "two additional shots [we]re fired before Deputy Dixon beg[an] to return fire himself."

According to Sergeant Hewell, when he got to the house where Deputy Dixon had been shot, "the suspect was not there," so Sergeant Hewell "began to run as fast as [he] could" to try and locate the suspect. As Sergeant Hewell was running, he came "face to face" with Garcia-Solis, who ran "away from [him] across the street." Sergeant Hewell gave Garcia-Solis commands to "show [his] hands [and] stop moving," but Garcia-Solis did not comply. Sergeant Hewell started shooting at Garcia-Solis and eventually "saw him fall." Sergeant Hewell then called for a medical unit, and Garcia-Solis was transported to the hospital. Garcia-Solis received a gunshot wound to the head near his left eye and survived. Deputy Dixon was shot once in the abdomen below his bulletproof vest. He was also transported to the hospital by law enforcement officers,

19

where—as the medical examiner confirmed at trial—he died from the gunshot wound to his abdomen.

(iv) *The events following the shootings*

Macias testified that, around 11:00 p.m. on the night of July 7, he was parked outside a restaurant in Hall County when Clements walked up to his truck. Macias noted that Clements was "sweaty" and moving around in a "fast type of way," and Macias thought that Clements seemed like he was in "shock" and "scared." Moments later, Macias and Clements saw "the cops" pass the restaurant, and Clements asked Macias if they could get into his truck. Clements got into the backseat and told Macias, "I think [Garcia-Solis] just killed a cop," and explained that a "cop car" was following them, Velazquez was driving, Garcia-Solis was in the passenger seat, and Cruz was also with them. Clements told Macias that "they were going to go hit licks that night." Clements asked Macias to drive him to his house, but Macias did not want to drive that far and risk "get[ting] pulled over." Macias drove Clements to Castillo's house, "which is one minute from the restaurant." When they arrived at Castillo's house,

20

Castillo testified that Clements was "all sweaty, all scared" and asked if he could borrow some clothes. Castillo testified that Clements told him "they crashed, they were running"—specifically, that "they were in a car that crashed that was being chased by police," that they all took off running in different directions, and that Clements "heard gunshots when he was running." According to Castillo, Clements also told Castillo that "he had been there when [Garcia-Solis] was shot" and "he was there when [Garcia-Solis] shot a cop." Castillo later revised his testimony on cross examination, stating that Clements only told him that Garcia-Solis had been shot, not that a police officer had been shot.

Macias testified that he and Clements stayed at Castillo's house "for a little bit," "trying to call [Garcia-Solis] and [Velazquez] to see if they were ok or see if anything had happened." When Velazquez answered, Velazquez asked Macias if Garcia-Solis was with him, and Macias replied that he was not there and they had been unable to reach him. During the phone call, Velazquez told Macias that "they were in the car and that the cop started following

21

them." Velazquez said that he "was the one driving," but "if [he] had a gun, [he] would have shot the cop [him]self, because the one that had two guns at the time was [Garcia-Solis]." Velazquez explained to Macias that he originally had "a gun on him," but "he had dropped it when he was getting out [of] the car" and thought Garcia-Solis had picked it up. Macias testified that, after this conversation, he left Castillo's house and went home.

According to Macias, on the morning of July 8, Velazquez texted him to ask if Velazquez could "hide the guns at the [ranch];" Macias agreed and met Velazquez there. Macias testified that Velazquez had about 20 guns, which they hid in the woods, and Velazquez told Macias that he "had a buyer" for the guns. Macias and Velazquez also hid an AK-47 rifle that Velazquez wanted to keep for himself inside the tire of a truck located "close to the gate" leading into the ranch. Macias observed that the .45-caliber handgun with the skull or helmet on it, which he had seen Garcia-Solis using on the afternoon of July 6, was not among the firearms they were hiding. Macias testified that, approximately two days

22

after assisting Velazquez with hiding the guns at the ranch, Macias was "picked up and questioned by the GBI" about his involvement in the crimes.

(v) *The subsequent investigation and arrests*

In the early morning hours of July 8, GBI Agents Taylor Lawrence and Elaina Coffee-Honea learned about "an officer involved shooting involving multiple suspects" in Hall County. When the agents arrived at the crime scene and started their investigation, they discovered shell casings on the porch of a house from Deputy Dixon's service revolver, as well as his hat and flashlight. They also found 9-millimeter shell casings and a .45-caliber shell casing from the suspect's weapons, as well as a 1911 Sig Sauer .45-caliber handgun, a black glove, a key to a Dodge Caliber, and shell casings from Sergeant Hewell's service revolver. GBI Agent Sarah Vanholm, a firearms examiner, testified that the .45-caliber Sig Sauer recovered at the scene had a helmet on the handle, and she further testified that, when she examined the fatal bullet removed from Deputy Dixon's body during his autopsy, she

23

established that the bullet was fired from this weapon. Law enforcement officers also confirmed that the .45-caliber Sig Sauer was stolen from Double Deuce Pawn on July 6.

On the morning of July 8, law enforcement officers investigating the crime scene area "spotted" Cruz under the shed where he had been hiding overnight and arrested him. GBI Special Agent Jamie Abercrombie testified that he interviewed Cruz following his arrest. Initially, Cruz "minimized and den[ied] his involvement in the crimes," but after "a lengthy amount of time," he "was forthcoming." Cruz provided Agent Abercrombie with the names of those who were with him the night before—Garcia-Solis, Clements, and Velazquez. Shortly thereafter, law enforcement officers executed a search warrant at Clements's residence, and Clements was arrested and taken into custody. Later that day, law enforcement officers executed a search warrant at Velazquez's residence, and he was arrested and taken into custody. During the search, law enforcement officers located plastic kitchen gloves similar to the gloves worn by one of the suspects during the

24

burglaries on July 6.

During Agent Abercrombie's investigation, he also learned that Macias potentially had information regarding the burglaries on July 6, and he interviewed Macias. Macias agreed to take Agent Abercrombie to the ranch and showed him "the location of the guns and where they were hidden," advising that he hid them with the assistance of Velazquez. Macias also showed Agent Abercrombie a video he had taken on his cell phone of Velazquez shooting guns at the ranch. Agent Abercrombie obtained a search warrant for the property, and after a search of the ranch, law enforcement officers collected ammunition, weapons, and some of the property that had been taken from Lester's van. Law enforcement officers confirmed that the weapons and ammunition had been stolen during the pawnshop burglaries on July 6.

At trial, Donna Lee—one of Garcia-Solis's trauma nurses—testified that, while Garcia-Solis was in the hospital being treated for his gunshot wound, he talked to her about the events leading up to the death of Deputy Dixon on July 7. Garcia-Solis explained that,

25

after the car chase began, the group's plan had been to leave one guy to shoot, while all the others ran. He then told her that he was the one who stayed and shot Deputy Dixon.

Garcia-Solis also testified at trial and admitted to the following: (1) he was one of the individuals who appeared in the surveillance video recordings presented at trial of the automobile dealership and pawnshop burglaries committed on July 6; (2) he was responsible for stealing weapons and other items during the burglaries; (3) he was armed during the burglaries; (4) Velazquez was with him during the burglaries; (5) Clements, Cruz, and Velazquez were with him on the night of July 7, and they planned to "hit a lick;" (6) he shot and killed Deputy Dixon; and (7) he committed a prior burglary at Texano Auto Sales in 2018.

After the State finished presenting evidence at trial, Garcia-Solis, Velazquez, and Clements moved for directed verdicts of acquittal on Count 3 – felony murder predicated on conspiracy to commit robbery and burglary and Count 5 – conspiracy to commit robbery and burglary. Clements also moved for a directed verdict on

26

Count 1 – malice murder, Count 2 – felony murder predicated on aggravated assault on a peace officer, and Count 4 – aggravated assault on a peace officer. Velazquez joined Clements's motion. As to Clements, the trial court granted his motion for a directed verdict on the malice murder, aggravated assault, and felony murder predicated on aggravated assault counts, but denied his motion as to the conspiracy to commit robbery and burglary count and the felony murder count predicated on conspiracy to commit robbery and burglary. The jury later convicted Clements of conspiracy to commit robbery and burglary and felony murder predicated on conspiracy to commit robbery and burglary. As to Velazquez, the trial court denied his motion for a directed verdict, and the jury later convicted Velazquez of all counts.

*Case No. S23A0857*

1. On appeal, Clements contends that the trial court erred by denying his motion for a directed verdict as to the conspiracy to commit robbery and burglary count (Count 5) and the corresponding felony murder count (Count 3) for the following reasons: (a) because

the defendants conspired to commit only burglaries, not robberies

and burglaries, see OCGA §§ 16-7-1 and 16-8-40;[8] and (b) because it

was not reasonably foreseeable that a law enforcement officer would

be killed as the result of a conspiracy to commit burglaries,

particularly burglaries of unoccupied businesses. We see no merit to

these claims.

> The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction. Under this review, we leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, we do not reweigh the evidence, and as long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

---

[8] A person commits the offense of burglary when, "without authority and with intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another" or "building" of another.  OCGA § 16-7-1 (b) and (c).  And

> a person commits the offense of robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another: (1) [b]y use of force; (2) [b]y intimidation, by the use of threat or coercion, or by placing such person in fear of immediate serious bodily injury to himself or to another; or (3) [b]y sudden snatching.

OCGA § 16-8-40 (a).

*Ellington v. State*, 314 Ga. 335, 339 (2) (877 SE2d 221) (2022) (citations and punctuation omitted).

(a) As an initial matter, we note that the conspiracy to commit robbery and burglary count "merged for sentencing purposes" with the felony murder count, and thus, Clements's challenge to the denial of his motion for a directed verdict on the conspiracy to commit robbery and burglary count is moot. *Ellington*, 314 Ga. at 340 (2). See also *Eggleston v. State*, 309 Ga. 888, 891 (848 SE2d 853) (2020) (holding that, because the aggravated assault counts merged with the felony murder count for sentencing purposes, the appellant's challenge to the sufficiency of the evidence on the aggravated assault counts was moot). We therefore limit our review to the one count for which Clements was convicted and sentenced—felony murder predicated on conspiracy to commit robbery and burglary.

(b) A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "The causation element

29

requires proof of proximate cause. Under the proximate-cause standard, the defendant is liable for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause." *Wilson v. State*, 315 Ga. 728, 733 (4) (883 SE2d 802) (2023) (citations and punctuation omitted). Determining whether it was reasonably foreseeable that death could result from the predicate crime requires considering "the elements of the felony not in the abstract, but in the actual circumstances in which the felony was committed." *Treadaway v. State*, 308 Ga. 882, 885 (1) (843 SE2d 784) (2020). In this case, it was reasonable to foresee that the dangerous criminal activities Clements and his co-conspirators were engaging in could lead to someone's death.

The evidence established that, on July 7, Clements and Cruz contacted Garcia-Solis and arranged to accompany him and Velazquez to "hit a lick," and they told their friend, Castillo, that they were "going to hit a lick at the pawn store" in a "stolen vehicle" to "steal [] guns and sell them." The evidence also established that, when these plans were made, Clements and Cruz knew Garcia-Solis

30

and Velazquez had broken into several automobile dealerships and pawnshops in the same area the night before and had stolen vehicles and more than 20 firearms, making increased police involvement foreseeable. And, as Clements concedes on appeal, when he and his co-conspirators embarked on this criminal venture, they were traveling in a stolen car, they were wearing masks, gloves, and dark clothing, and two of them were carrying loaded firearms, supporting a finding that Clements and his co-conspirators were prepared to take property by force if they were to encounter someone.

Under these circumstances, it was reasonably foreseeable that Clements and his co-conspirators could encounter law enforcement and that someone could be killed during the commission of these crimes. See *Martin v. State*, 310 Ga. 658, 661 (1) (852 SE2d 834) (2020) (holding that it was not unforeseeable that "someone might get shot during the commission of such an obviously dangerous and illegal enterprise") (citation omitted). In other words, the evidence authorized the jury to conclude that a person's death was "a probable and or natural consequence" of the criminal conduct, *Eubanks v.*

*State*, __ Ga. __, __ (2) (a) (ii) ( __ SE2d __ ) (Case No. S23A0519, decided October 24, 2023), and the trial court did not err by denying Clements's motion for directed verdict with respect to the felony murder predicated on conspiracy to commit robbery and burglary count.

2.     Clements next contends that the trial court failed to exercise its discretion as the "thirteenth juror" in denying his motion for new trial because the verdict was "contrary to the evidence and strongly against the weight of the evidence."   "That argument implicates the 'general grounds' for obtaining a new trial under OCGA §§ 5-5-20 and 5-5-21."[9] *King v. State*, 316 Ga. 611, 615 (2) (889 SE2d 851) (2023).

> When these so-called general grounds are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a thirteenth juror. This role requires the judge to consider matters typically

---

[9] OCGA § 5-5-20 provides that, "[i]n any case when the verdict of a jury is found contrary to the evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury."  OCGA § 5-5-21 provides that "[t]he presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence.

*Ridley v. State*, 315 Ga. 452, 456 (3) (883 SE2d 357) (2023) (citations and punctuation omitted).  See also *Strother v. State*, 305 Ga. 838, 843 (3) (828 SE2d 327) (2019) ("In exercising his discretion as the thirteenth juror, the trial judge must consider some of the things that he cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.") (citation and punctuation omitted). "But as an appellate court, we do not independently review the record as a thirteenth juror," and "[t]he decision to grant or refuse to grant a new trial on the general grounds is vested solely in the trial court." *Ward v. State*, 316 Ga. 295, 299 (3) (888 SE2d 75) (2023) (citation and punctuation omitted).  See also *Strother*, 305 Ga. at 843 (3) (explaining that "this Court does not sit as an arbiter of the general grounds, which are solely within the discretion of the trial court").  And "[w]e presume, in the absence of evidence to the

contrary, that the trial court did properly exercise such discretion." *Ward*, 316 Ga. at 299 (3) (citation and punctuation omitted).

We conclude that the trial court exercised its discretion as the thirteenth juror here. During the hearing on Clements's motion for new trial and in the trial court's order denying the motion, the trial court "expressly rejected" Clements's "general grounds claim," *King*, 316 Ga. at 616 (2), and stated that it reviewed and weighed the evidence presented, assessed the credibility of the witnesses, and "acting as the thirteenth juror," concluded that the State presented sufficient evidence to support the jury's verdict and "to find []"
Clements guilty beyond a reasonable doubt." Clements has "offered no basis for concluding otherwise." *Ward*, 316 Ga. at 299 (3). And, to the extent a sufficiency analysis is also required for this general grounds claim, see *King*, 316 Ga. at 616 (2) n.8, we concluded in Division 1 that the evidence presented against Clements was "constitutionally sufficient to affirm his convictions" in this case. Id.. Accordingly, this claim fails.

34

3.     Velazquez contends that the evidence was insufficient as a matter of constitutional due process to sustain his convictions for malice murder (Count 1) and felony murder predicated on aggravated assault on a peace officer (Count 2).[10]  Velazquez argues that no evidence was presented to show that the defendants had a plan to shoot someone on the night of July 7 or that Velazquez knew Garcia-Solis was going to shoot Deputy Dixon.  Velazquez further argues that he was the first one to exit the vehicle following the crash and that he ran away from the scene, demonstrating that he had abandoned "any and all criminal intent" and was trying to run away and hide.  We disagree.

> When assessing a challenge to the sufficiency of the evidence as a matter of constitutional due process, the evidence presented at trial is viewed in the light most favorable to the verdicts to determine whether any

[10] As noted earlier in the opinion, Velazquez's felony murder conviction predicated on aggravated assault on a peace officer was "vacated by operation of law," *Graves*, 298 Ga. at 556 (4), and Velazquez's aggravated assault on a peace officer count merged with the malice murder count. Consequently, Velazquez was not "convicted of or sentenced" for these counts, *Worthen*, 304 Ga. at 865 (2), and his challenge to the sufficiency of the evidence as to these counts is moot. See *Collett v. State*, 305 Ga. 853, 855 n.2 (828 SE2d 362) (2019).

rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the crimes of which he was convicted. In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury. The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case.

*Ridley*, 315 Ga. at 455 (2) (citing *Jones v. State*, 304 Ga. 594, 598 (2) (820 SE2d 696 (2018)). See also *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Applying that standard here and viewing the evidence in the light most favorable to the verdicts, we conclude that the evidence was sufficient as a matter of constitutional due process to support Velazquez's conviction for malice murder.

"A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). In this case, Velazquez was charged individually and as a party concerned in the commission of malice murder, and thus, the State did not need to prove that Velazquez fatally shot Deputy Dixon—"it was enough to

36

prove that he was a party to the crime." *Ward*, 316 Ga. at 298 (2).

> [U]nder OCGA § 16-2-20 (a), "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the direct perpetrator of the crimes. A jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with the other perpetrator before, during, and after the crimes.

*Felts v. State*, 311 Ga. 547, 552 (2) (858 SE2d 708) (2021) (citations and punctuation omitted).

In this case, the State presented evidence showing that Velazquez "shared a common criminal intent" with Garcia-Solis before, during, and after the shooting of Deputy Dixon. *Felts*, 311 Ga. at 552 (2). The evidence established that, on July 6, Velazquez and Garcia-Solis armed and masked themselves and committed a series of burglaries in which they stole ammunition and a large number of firearms. The next day, they conspired with Clements and Cruz to continue committing such crimes—i.e., hitting "licks"— which several witnesses described as committing robberies, burglaries, or both. On the night of July 7, Velazquez, Garcia-Solis,

37

Cruz, and Clements went to the thrift store where the stolen Dodge and Toyota were parked, and they entered one of the vehicles and "geared up" by "putting on gloves, masks, [and] getting ready." Velazquez and Garcia-Solis were also armed with handguns. Velazquez drove the stolen vehicle that night, and as law enforcement officers attempted to stop the stolen vehicle, Velazquez kept driving, ultimately resulting in a car chase, a crash, and a foot chase. Surveillance video recordings from a laundromat adjacent to the crash site demonstrated that Velazquez ran away in the same direction as Clements, Cruz, and Garcia-Solis. Garcia-Solis also testified that Velazquez was with him around the time of the shooting. Additionally, after the shooting, Velazquez spoke to Macias on the phone and told Macias that he had a gun that night, he dropped it when he got out of the car after the crash, and he knew Garcia-Solis also had a gun and probably picked up his gun, as well. Velazquez also told Macias that, "if [he] had a gun, [he] would have shot the cop [him]self, because the one that had two guns at the time was [Garcia-Solis]." The day after the shooting, Velazquez took the

38

firearms he and Garcia-Solis had stolen on July 6 and hid them at Macias's ranch. Velazquez told Macias that he was still planning to sell the firearms and was saving a stolen AK-47 rifle for himself.

Based on this evidence, the jury was authorized to find that Velazquez "shared a common criminal intent" with Garcia-Solis and was a party to the malice murder of Deputy Dixon. *Felts*, 311 Ga. at 553 (2). And, thus, the evidence was sufficient to sustain the jury's verdict on the malice murder count, and this claim fails.

4. Velazquez also contends that the trial court erred in denying his motion for a directed verdict as to Counts 3, 5, and 7 through 14 because the testimony of his co-conspirators was not corroborated as required by OCGA § 24-14-8.[11] The record reflects that, at trial, Velazquez did not move for a directed verdict as to

---

[11] Pursuant to OCGA § 24-14-8,

[t]he testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

Counts 7 through 14, and thus, Velazquez's argument with respect to those counts was not preserved for our review. Additionally, because—as noted in Division 3—Velazquez's felony murder conviction predicated on conspiracy to commit robbery and burglary (Count 3) was "vacated by operation of law," *Graves*, 298 Ga. at 556 (4), his challenge to the denial of his motion for a directed verdict as to that count is moot. See *Collett*, 305 Ga. at 855 n.2. Thus, we review only the trial court's denial of Velazquez's motion on Count 5 – conspiracy to commit robbery and burglary.

> When reviewing the denial of a motion for directed verdict, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

*Ward*, 316 Ga. at 300 (4) (citation and punctuation omitted). Velazquez argues that his motion for a directed verdict as to the conspiracy to commit robbery and burglary count should have been granted because (1) there was no "independent[,] properly admitted corroborating evidence that there was a plan to 'hit a lick' on the

40

evening of July 7"; (2) Velazquez "was not involved in discussions that took place" about committing any crimes that night; and (3) the trial testimony demonstrated that "the plan was simply to drive around on the night of July 7[.]" We see no merit to this claim.

As detailed in Division 3, the evidence presented in this case was sufficient to support Velazquez's conviction for conspiracy to commit burglary and robbery and was also sufficient to corroborate his co-conspirators' testimony as required by OCGA § 24-14-8.

> Although OCGA § 24-14-8 provides that corroboration is required to support a guilty verdict in "felony cases where the only witness is an accomplice," only slight evidence of corroboration is required. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime.

*Huff v. State*, 300 Ga. 807, 809 (1) (796 SE2d 688) (2017) (citations and punctuation omitted).

Not one, but two of Velazquez's accomplices testified at trial—Cruz and Garcia-Solis—and sufficiently corroborated one another's testimony about Velazquez's involvement in planning and executing

41

the crimes committed on July 6 and his part in planning the similar crimes the defendants hoped to commit on July 7. Additionally, Velazquez's own statements to Macias after the shooting on July 7— i.e., that he had been with Garcia-Solis and Clements that night and that he would have shot the "the cop" himself if he still had a gun on him—was corroborating evidence of Velazquez's "conduct before and after the crime was committed." *Huff*, 300 Ga. at 809 (1). Macias also testified about how he assisted Velazquez the next day in hiding the stolen firearms—firearms which the evidence established were stolen from a pawnshop on July 6. This testimony also corroborated Velazquez's conviction in this case. See id.

"Whether accomplice testimony has been sufficiently corroborated is a question for the jury, and even slight corroborating evidence of a defendant's participation in a crime is sufficient." *Williams v. State*, 313 Ga. 325, 329 (1) (869 SE2d 389) (2022). The evidence as recited above, which related to Velazquez's conduct before, during, and after the crimes, connected Velazquez to the crimes charged, "was constitutionally sufficient to support"

42

Velazquez's conviction for conspiracy to commit robbery and burglary, *Williams*, 313 Ga. at 329 (1), and satisfied the statutory requirement under OCGA § 24-14-8 that "corroborating circumstances" support Velazquez's guilty verdict. See *Huff*, 300 Ga. at 809 (1).

5. Velazquez next contends that the trial court erred in denying his motion to transfer venue under OCGA § 17-7-150.[12] We disagree.

---

[12] This statute provides that

> [t]he defendant, in any criminal case in which a trial by jury is provided, may move in writing for a change of venue, whenever, in the defendant's or defense counsel's judgment, an impartial jury cannot be obtained in the county where the crime is alleged to have been committed. Upon the hearing of the motion it shall not be necessary to examine all persons in the county liable to serve on juries, but the judge shall hear evidence by affidavit or oral testimony in support of or against the motion. If, from the evidence submitted, the judge is satisfied that an impartial jury cannot be obtained to try the case, the judge shall grant a change in venue. The judge shall transfer the case to any county that may be agreed upon by the prosecuting attorney and the defendant or the defense counsel, to be tried in the county agreed upon. The judge has the discretion to reject any county agreed upon; if a county is not thus agreed upon, or if the judge, in the exercise of discretion, rejects a county agreed upon, the judge shall select such county as in the judge's judgment will afford a fair and impartial jury to try the case and have it transferred accordingly.

OCGA § 17-7-150 (a) (1) (A).

43

Prior to trial, Garcia-Solis filed several pretrial motions, including a motion to transfer venue, and Velazquez joined the motions. The trial court held a hearing on the motion to transfer venue in June 2020, and at the hearing, Garcia-Solis tendered two witnesses from the Hall County Public Defender's Office—an investigator and a legal assistant—to testify about their online research of media coverage related to the case and their personal experiences with community publicity related to the death of Deputy Dixon, such as memorials and similar displays. The trial court denied the motion in a written order, advising that it was not prevented "from inquiring if there is actual prejudice to a degree that renders a fair trial impossible at the time a jury is selected." Following jury selection at trial, Garcia-Solis renewed his motion to transfer venue, which Velazquez joined, and the trial court denied the motion. On appeal, Velazquez asserts that the trial court abused its discretion in denying the motion because there was a high likelihood of prejudice and because he could not receive a fair trial

in Hall County due to the pretrial publicity and the posted community memorials to Deputy Dixon.

> To succeed on a motion for change of venue, "a defendant must show either that the setting of the trial was inherently prejudicial or that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." The decision to grant or deny a motion for change of venue will not be disturbed absent an abuse of discretion.

*Moss v. State*, 305 Ga. 878, 881 (2) (828 SE2d 309) (2019) (quoting *Heidt v. State*, 292 Ga. 343, 348 (4) (736 SE2d 384) (2013)). We see no abuse of discretion here.

With respect to "inherent prejudice," this Court has said that, "even in cases of widespread pretrial publicity, situations where such publicity has rendered a trial setting inherently prejudicial are extremely rare." *Heidt*, 292 Ga. at 348 (4) (citation and punctuation omitted). To demonstrate "inherent prejudice," the "record must establish that the publicity contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." Id.

45

Here, Velazquez asserts that the local newspaper—which has a print subscription base of 17,500—published and posted articles about this case on its Facebook account, which has 30,000 followers. Velazquez also asserts that community displays and memorials to Deputy Dixon were posted "throughout Hall County." However, Velazquez has not shown or argued that any of these articles or memorials "contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." *Heidt*, 292 Ga. at 348 (4). In short, he has made no showing of inherent prejudice, and the record does not support such a claim.

Additionally, Velazquez has made no showing "that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Heidt*, 292 Ga. at 348 (4).

> As to actual prejudice, . . . the question is not the number of jurors who had heard about the case or had knowledge of those involved in the case, but whether those jurors who had heard about the case could lay aside their opinions and render a verdict based on the evidence.

*Moss*, 305 Ga.at 881 (2) (citation and punctuation omitted).

46

Here, after noting that 19 jurors were excused for cause, Velazquez argues that the trial court used "flawed logic" in its consideration of the pretrial publicity and failed to properly consider the memorials to Deputy Dixon in calculating the probability of Velazquez's ability to receive a fair trial and in denying his request to transfer venue. However, the record shows that the trial court applied the appropriate standard and asked jurors the proper, statutory questions in determining whether they could be fair and impartial in this case. And, while Velazquez correctly recites that 19 jurors were excused for cause, the record reflects that only *one* of those jurors was excused because of his feelings about the case. The remaining jurors were excused for "vacation or health reasons or direct knowledge because they were somehow related to the victim" or just refused to participate—"it didn't matter what case it [wa]s." Moreover, in denying the motion to transfer venue, the trial court observed that the jury questionnaires revealed most of the jurors "knew little to nothing about the case" and that, during the more than two years since the crimes had been committed, there had been

47

a "global pandemic" and "presidential election," among other significant events. We conclude that these circumstances are "not indicative of such prejudice that the trial court's denial of a change in venue was an abuse of discretion." *Moss*, 305 Ga. at 881 (2). As such, this claim fails.

6. Velazquez also contends that the trial court abused its discretion by denying his motion for mistrial after Garcia-Solis impermissibly testified about prior bad acts involving Velazquez and improperly linked Velazquez to the crimes charged without any corroborating evidence identifying Velazquez as one of the perpetrators.

By way of background, the record reflects that the trial court entered a pretrial order allowing the State to present evidence of two August 2018 burglaries allegedly committed by Garcia-Solis and Velazquez pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)").[13]

---

[13] Pursuant to Rule 404 (b):
Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive,

During the direct examination of Garcia-Solis, the following exchange occurred between Garcia-Solis and his trial counsel:

[COUNSEL]: Let me talk a little bit with you about your past and about other bad decisions you made. Hector, was that weekend the first time you ever committed a burglary?

[GARCIA-SOLIS]: No.

[COUNSEL]: Tell the jury about the first times you committed burglaries.

[GARCIA-SOLIS]: The very first ones was Go Auto Sales.

[COUNSEL]: What happened?

[GARCIA-SOLIS]: Just me and Eric, some other dude –

At that point, Velazquez's trial counsel objected, stating that "[a]ny past acts by Mr. Velazquez cannot be brought up." The trial court

---

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

excused the jury. Velazquez then moved for a mistrial, arguing that Garcia-Solis's testimony violated the court's limiting instructions. Velazquez also argued that he was being denied a fair trial because Garcia-Solis was admitting to all the offenses charged in the indictment when no corroborating evidence had been presented linking Velazquez to the crimes.

The trial court denied the motion for mistrial. When the jury was brought back into the courtroom, the trial court instructed the jury as follows:

> Now, before we broke, [Garcia-Solis's trial counsel] asked a question and Mr. Garcia-Solis had given a response. I believe it was something to do with a place called Go Auto. And I'm going to ask that you disregard the question and the response that Mr. Garcia gave, as the question and the response were outside the rules established for this case.

The trial court then gave the following instructions:

> Ladies and gentlemen, sometimes evidence is admitted for a limited purpose against some parties and not others and for some counts and not others. Such evidence may be considered by the jury for the sole issue and purpose against that party and only for the counts for which the evidence is limited and not for any other purpose.

50

In order to prove its case in counts seven, eight, nine, ten, eleven, thirteen, and fourteen against Mr. Eric Edgardo Velazquez, the State must prove intent and may prove knowledge and plan. To do so, the State may offer evidence of other acts alledgedly [sic] committed by the accused Mr. Eric Edgardo Velazquez. You are permitted to consider that evidence only insofar as it may relate to that defendant and those issues and not for any other purpose.

You may not infer from such evidence that the defendant is of a character that would commit such crimes. The evidence may be considered only to the extent that it may show the issues that the State is required or allowed to prove in the crimes charged for the case now on trial.

Such evidence, if any, may not be considered by you for any other purpose or against any other defendant. The defendant is on trial for the offenses charged in this bill of indictment only and not for any other acts, even though such acts may incidentally be criminal.

Before you may consider any other alleged acts for the limited purposes stated, you must first determine whether it is more likely than not that the accused committed the other alleged acts. If so, you must then determine whether the acts shed any light on the issue for which the act was admitted and the crimes charged in the indictment in this trial.

Remember to keep in mind the limited use and the prohibited use of this evidence about other acts of the defendant Mr. Velazquez. By giving this instruction, the court in no way suggests to you that the defendant has or has not committed any other acts or whether such acts, if

committed, prove anything. This is solely a matter for your determination.

Velazquez did not object to the trial court's instructions or renew his motion for mistrial after the instructions were given. Thus, Velazquez has waived this issue on appeal, and we will not address it. See *Hartsfield v. State*, 294 Ga. 883, 886 (2) (757 SE2d 90) (2014) ("[B]ecause [the defendant] failed to renew his motion for mistrial following the trial court's admonishment and curative instruction, he has waived the issue on appeal.").

7. Velazquez also claims that he received constitutionally ineffective assistance of counsel in this case when his trial counsel failed to object to the admission of hearsay testimony and improper character evidence at trial. We see no merit to this claim.

To prevail on his ineffectiveness of counsel claim, Velazquez must establish that his trial counsel's representation was "constitutionally deficient" and that "he was prejudiced by counsel's deficient performance," *Payne v. State*, 314 Ga. 322, 328 (3) (877

SE2d 202) (2022), "meaning that but for counsel's deficient performance, a reasonable probability exists that the outcome at trial would have been different." *Fitts v. State*, 312 Ga. 134, 139 (2) (859 SE2d 79) (2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)).

> To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms. To establish prejudice, [the defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo.

*Payne*, 314 Ga. at 328-329 (3). If Velazquez fails to establish "either deficient performance or prejudice, then we need not address the other." *Fitts*, 312 Ga. at 139 (2).

(a) Velazquez first contends that his trial counsel was ineffective for failing to object to the following hearsay statements: (1) Macias's testimony regarding Velazquez's and Garcia-Solis's

visit to the ranch on July 6 and the burglaries they allegedly committed the night before, which was purportedly based on statements from "Adrian"—a mutual friend who did not testify at trial  (2) Macias's testimony about the defendants' plan to "hit a lick" on the night of July 7, including Velazquez's comment that, "if [he] had a gun, [he] would have shot the cop [him]self," which was based on statements from co-defendant Clements, who did not testify at trial  and (3) testimony from Donna Lee, Garcia-Solis's trauma nurse, recounting statements Garcia-Solis made to her about the group's plan to leave "one" guy "to shoot at the cop," while the others ran away. We conclude that trial counsel did not perform deficiently in deciding not to object to this alleged hearsay testimony.

As for the statements Adrian made to Macias on July 6 concerning whether Velazquez and Garcia-Solis could come out and shoot guns at the ranch that day, these statements were not offered to prove the truth of the matter asserted and so were not hearsay. See OCGA § 24-8-801 (c) ("'[h]earsay' means a statement, other than one made by the declarant while testifying at the trial or hearing,

54

offered in evidence to prove the truth of the matter asserted"). These statements were also cumulative of what Velazquez and Garcia-Solis told Macias themselves, and thus, "trial counsel was not deficient in failing to object to the cumulative testimony of the witness on this matter." *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) (citation and punctuation omitted).

As for the statements Clements made to Macias on the night of the shooting—i.e., that Clements, Cruz, Garcia-Solis, and Velazquez were planning to "hit licks that night" this testimony was cumulative of Garcia-Solis's testimony regarding the co-conspirators' plans on July 7, and trial counsel was not deficient in failing to object and Velazquez was not prejudiced by the admission of this testimony at trial. See *Sawyer*, 308 Ga. at 384 (2) (b).

As for Macias's testimony regarding Velazquez's statement that, "if [Velazquez] had a gun, [he] would have shot the cop [him]self," this testimony was not based on statements relayed to Macias by Clements. The record reflects that Velazquez made these statements directly to Macias during a phone call on the night of the

55

shooting. It is well established that Velazquez's own statements were admissible against him at trial as the "admissions of a party opponent." *Lyons v. State*, 309 Ga. 15, 28 (8) (d) (843 SE2d 825) (2020). See also OCGA § 24-8-801 (d) (2) (A) ("Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is: . . . The party's own statement, in either an individual or representative capacity[.]"). Additionally, this was a statement against interest which was not excluded by the hearsay rule. See OCGA § 24-8-804 (b) (3). See also *Kennebrew v. State*, __ Ga. __, __ (3) (893 SE2d 96) (2023). Accordingly, an objection to this statement would have been meritless, and "[f]ailure to lodge a meritless objection does not support an ineffective assistance claim." *Lyons*, 309 Ga. at 28 (8) (d).

With respect to Lee's testimony regarding the statements Garcia-Solis made to her in the hospital about the defendants' plan to leave one person "to shoot the cop" while the others ran away, because Garcia-Solis was also on trial, these statements were the "admissions of a party opponent" and were not excluded by the

56

hearsay rule. *Lyons*, 309 Ga. at 28 (8) (d). See also OCGA § 24-8-801 (d) (2) (A). Thus, Velazquez's trial counsel was not deficient in failing to object to this testimony.

(b) Velazquez also argues that the admission of the testimony from Macias and Lee was a "clear violation" of *Bruton v. United States*, 391 U.S. 123, 136-137 (88 SCt 1620, 20 LE2d 476) (1968). We disagree.

"A defendant's right under the Confrontation Clause is violated under *Bruton* . . . when there is a joint trial of co-defendants and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime or crimes on trial." *Fitts*, 312 Ga. at 140 (2).

> However, the admission of an out-of-court statement into evidence at a criminal trial comes within the scope of the Confrontation Clause only if the statement was testimonial. A statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution. Testimonial statements include statements made to a government officer, during a police investigation or interrogation, or intended to accuse someone of a crime and produce evidence for a criminal prosecution.

Id. (citations and punctuation omitted). In this case, while Velazquez was tried jointly with his co-defendants, none of the statements he complains of were "testimonial" in nature or made with the "primary purpose" of establishing "evidence for use in a future prosecution," and thus, *Bruton* does not apply. Id.

(c) Velazquez also contends that his trial counsel was ineffective for failing to object to testimony elicited from Macias that allegedly placed Velazquez's character into evidence. On cross-examination, Macias was asked whether he felt that Velazquez was a "bad influence" on Garcia-Solis, and Macias replied, "Yes." Velazquez asserts that this testimony prejudiced his defense. We disagree and conclude that Velazquez has failed to show that trial counsel performed deficiently or that any prejudice resulted even if we assume deficient performance. See *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) ("[P]retermitting whether [the witness's] testimony was improper character evidence that should have been excluded under Rule 404 (a), [the] statement was

58

harmless because it was cumulative of a significant volume of evidence already presented to the jury without objection[.]")

"In general, evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion." *Sawyer*, 308 Ga. at 384 (2) (citing OCGA § 24-4-404 (a)). Moreover, "[r]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal." Id. at 381 (2) (citation and punctuation omitted). See also *Fitts*, 312 Ga. at 145 (5) ("Trial tactics or strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them."). "[A]bsent evidence to the contrary, counsel's actions are presumed strategic." *Fitts*, 312 Ga. at 145 (5).

Even if Macias's testimony was improper character evidence that should have been excluded under OCGA § 24-4-404 (a), the admission of this testimony did not prejudice Velazquez's defense given the other compelling evidence detailed above, including his

commission of a series of burglaries with Garcia-Solis on July 6; his plan to commit additional burglaries with Garcia-Solis, Cruz, and Clements on July 7; his position as the driver of the stolen vehicle on July 7 before and during the car chase; and his admission that he would have shot the deputy, as well, if he had been armed. See *Green v. State*, 304 Ga. 385, 391-392 (2) (b) (818 SE2d 535) (2018) (holding that, "even assuming that trial counsel rendered deficient performance," the appellant did not meet "his burden to show that he was prejudiced by any failing of counsel"). Therefore, this claim of ineffective assistance of counsel also fails.

*Judgments affirmed. All the Justices concur.*